A. A. TATE v. T. C. BETTERTON, DOING BUSINESS UNDER NAME OF TENNESSEE COFFIN & CASKET COMPANY.

Eastern Section.  March 27, 1926.

Writ of Certiorari denied by Supreme Court June 24, 1926.

1. Contracts.  An unequivocal announcement of an intention to break the contract made by one party which was not accepted by the other party and which was later withdrawn, held not to justify a breach of the contract later.

In an action to recover for the value of cedar lumber sold and which was not accepted by the defendant where the evidence showed that the plaintiff at one time wrote to the plaintiff that he would not ship any more lumber to him but defendant ignored the suggestion and in his reply requested a delay in shipments until further ordered, and the plaintiff later offered additional shipments, held that the defendant was not justified in later breaching his contract because of the statement made by the plaintiff.

2. **Contracts.** **Evidence.** Evidence held not to show a breach of contract. In an action to recover the sale price of cedar lumber which defendant refused to accept under a contract where the evidence showed that the parties had considerable correspondence and at one time the plaintiff wrote that he would not ship any more lumber, but that the defendant ignored this statement and they continued to correspond in regard to the shipping of lumber held, that the evidence showed a breach of contract on the part of the defendant.

Appeal from Chancery Court, Hamilton County; Hon. W. B. Garvin, Chancellor.

Affirmed.

Allen S. Kelly, and Moore & Lynch, of Chattanooga, for appellant.

F. S. Carden, of Chattanooga, for appellee.

SNODGRASS, J. This is an action for damages, predicated upon an alleged breach of contract to take and pay for certain cedar lumber at the rate of $100 per M̈. feet, f. o. b. the cars at shipping station.

The execution of the contract was not denied, but the breach thereof was denied, it being insisted that the complainant himself breached the contract by shipping lumber improperly manufactured; but especially, and more seriously, in announcing that he would never ship the defendant another car of lumber. This announcement, it was insisted, was accepted by the defendant, who acted upon it and bought lumber elsewhere, the complainant having been notified of such acceptance by being directed not to ship any more lumber in a postscript to a letter of May 6, 1920, and which was in reply to the one of April 29 announcing, as alleged, that the complainant would not ship another car. This postscript is as follows:

"Kindly do not ship us further, unless you notify us beforehand and we so advise you."

The contract and letter transmitting it is as follows:

"Chattanooga, Tenn., 2-20-20

"CONTRACT BETWEEN TENNESSEE COFFIN & CASKET CO.,

"PARTY, OF THE FIRST PART, AND A. A. TATE, PARTY OF THE SECOND PART.

"Party of the second part contracts to ship all of the cedar lumber, same to be cut 1″ thick, that he may be able to cut and ship during 1920, to party of the first part, Chattanooga, Tenn.

"Party of the first part agrees to pay for this stock at the rate of one hundred ($100) dollars per thousand f. o. b. South Pittsburgh or any loading station on the Sequatchie Branch of the N. & C. Railroad, or on the main line of the N. & C. Railroad anywhere between Cowan, Tenn. and Chattanooga.

"TENNESSEE COFFIN & CASKET CO.

"Per T. C. Betterton,

"Sec'y & Treas."

"Grade: Log run- mill culls out.

The bill charged that the complainant's mill had a capacity of two carloads per month of 14,000 feet each, and that it was this output of two carloads per months for the year 1920, beginning with April 20th, that was contemplated and covered by the provisions of this contract; that in good faith the complainant went forward in the performance of the same, manufacturing and shipping lumber, delivering same to defendant as provided in the contract, up to sometime in April, 1920; that meanwhile the market price of cedar lumber of the grade covered by this contract had declined or fallen $30 per thousand, so that on April 20, 1920, and continuously since that time cedar lumber of the grade and character covered by this contract was worth in the market not over $70 per thousand feet; that controversies arose over the measurement, and that later defendant began to question the fact that lumber was cut wider at one end than at the other; that at first the measurement was adjusted by dividing the difference, but later when the market continued to decline defendant refused to settle except by its own measurement and deducted all the difference in the measurements.

The bill then set out further alleged excuses for postponing shipment advanced by defendant, and that on May 17th the defendant wrote:

"We do not feel under any obligations whatever to accept more of this cedar from you at this time." And,

"Under no circumstances would we be willing to accept further cars of cedar cut as the several cars you have shipped have been cut. We complained to you a number of times about your wedge shaped boards, and on the last car there was a difference of some 700 feet, due to the fact that so large a per centage of your boards were cut wedge shaped," etc.

The bill charged that at the time the contract was made it was the custom of cedar mills to cut the cedar boards wedge shaped, of which custom purchasers of cedar, including the defendant, well knew; moreover, that the cedar lumber that the complainant had sold to the defendant immediately before the contract was entered into was cut with a part of the lumber tapering or wedge shaped, that is, somewhat wider at one end than the other; that the reason for sawing lumber in this manner is that cedar is a very valuable timber; that cedar trees taper faster than other classes of timber, and that the contract was entered into in view of this custom, which custom it was alleged was a part of the contract; that the price of the lumber was in part made with this in view, otherwise a higher price would have been charged for it at the time; that consequently defendant's insistence, that the cedar should be sawed with all boards of same width at each end, was contrary to the contract and unjustified.

The bill, substantially averring complainant's ability and willingness to fulfill the contract, states that complainant continued to insist upon his right to deliver the lumber under his contract, until finally, on May 28th, defendant wrote him declining to receive any shipment, and stating that if complainant shipped a car or cars of cedar without specific orders defendant would refuse to accept the same, and that they would be held at complainant's disposal and request; that further offers of shipment were curtly declined; that the contract was wrongfully breached by defendant, without excuse, who refused, it was alleged, to take and pay for the cedar lumber at the rate of two carloads per month for the remainder of the year 1920, from and after April 20, 1920, a period of eight months, making 16 cars; that during the time from the 20th of April to the 12th of May, while defendant was asking complainant to withhold shipments until further notice, complainant manufactured and had on hand and ready to ship two carloads of cedar, which complainant held until after breach of the contract; that thereafter complainant sold said lumber for $70 per M, which was the market price thereof, and the best price obtainable for said cedar lumber, and which continued to be equal to or greater than the market price for the remainder of the year; the bill charges that damages of $30 per M. on 16 carloads of 14,000 feet per carload amounts to the sum of $6,720, which, with interest, was claimed to be justly due and owing to complainant from the defendant.

As stated, the answer admitted the contract; stated that it was not advised of the capacity of the complainant's mill, but that complainant informed defendant that he had a certain amount of cedar timber, and that he could cut from one to two carloads of this per month and ship it to defendant, and that upon these representations the contract set out in complainant's bill was entered into; that complainant did ship various and sundry cars to defendant under this contract, as he had done prior thereto; that most of said lumber was satisfactory in grade, with the exception, it was stated, that it was badly manufactured, the larger portion being cut in tapering boards—that is, wide at one end and narrow at the other, when it was insisted it should have been cut square; that this caused complainant and defendant to have various misunderstandings and disagreements about the former's measurement thereof; that complainant insisted upon measuring the lumber one way, and defendant insisted upon measuring it another; that complainant's method of measurement resulted in considerable loss and wastage to the defendant, while defendant's method had been the one that had been in vogue by it during its years in dealing with lumber; that, owing to the misunderstanding thus engendered, on April 29, 1920, complainant wrote to defendant stating positively that he would "never

ship to defendant another car of lumber;'' that, believing complainant's statement thus made, and also having in mind the inability of the parties to agree upon a method of measurement, and the previous uncertainties of complainant's deliveries, defendant accepted said breach of said contract by complainant, and proceeded to enter the market and purchase a supply of cedar elsewhere to replace that which had been expected from complainant. It was denied that the price of cedar fell to $70 per M in the early part of 1920, but it was averred that during the whole of that year defendant paid from $85 to $100 per M, for cedar lumber, depending somewhat upon the grade of same.

The answer insisted that the question as to measurement of lumber arose even before the contract of February 20, 1920, was entered into; that said contract was made on the explicit statement by the complainant that tapering or wedge shaped boards would be practically eliminated, and that if such boards were shipped they would be measured at the narrow end. The answer neither admitted nor denied the custom of the cedar mills with reference to cutting cedar boards in wedge or tapering shape, but averred that it had never been the custom of the defendant to pay for such boards except upon the measurement of the smaller end thereof.

The answer denied that defendant had breached its contract with complainant, but, as stated, insisted that complainant had himself breached it.

The issues thus exhibited by the bill and answer are shown at length, because it makes manifest that certain contentions in the brief, that the shipping to defendant of wedge shaped or tapering boards was a breach of the contract, is thus admittedly shown to be in no violation thereof, but only involved a question of measurement to determine the quantity in the car; and the effort in the proof and in the brief to exalt 'this issue between them into that dignity reflects only upon the sincerity of the defendant, whereas, under the issues of veracity as they took form in this case, he required the support of every corroborative consistency. His effort in the proof to minimize the quantity of wedge shaped boards that might be expected to appear in a given quantity by attributing their form to the accidental turn of the board in their manufacture, his experience and evident knowledge, could only have the effect to weaken his testimony upon the real issues presented by the other phases of the record.

While the Chancellor in the brief is criticized as side-stepping an issue raised as to the letter of February 29th, we think his statements in relation thereto were somewhat indicative of his real opinion upon one of the questions of fact upon which he did not announce his opinion. He chose rather to rest his conclusion upon the fact that, even if the said letter might be regarded as an unequiv-

ocal announcement of an anticipatory breach of the contract, he yet found that such announcement, if made, had been recanted, within the rights of the complainant. This being his opinion, he had the right to pretermit the other questions involving the painful considerations entailed. In doing so, however, he involved the case in the only doubt which the preliminary issue as to the breach carried.

The case came on to be heard before the Chancellor upon the whole record, and his finding laid the actionable breach of the contract at the door of the defendant; and a decree was entered that the respondent, T. C. Betterton, breached the contract with complainant, A. A. Tate, to receive and pay for cedar lumber, and that complainant was entitled to recover damages from respondent, T. C. Betterton, on account of the breach of said contract, whereby respondent T. C. Betterton was bound to receive and pay for cedar lumber at the rate of two carloads per month during the eight months of the year 1920 which he refused to receive and pay for. From the proof the court fixed the capacity of the cars at 14,000 feet each, and decreed that complainant, A. A. Tate, is entitled to recover from the defendant, T. C. Betterton, damages measured by the difference between the contract price of $100 per M feet and the market price during the eight months from May 1 to December 31, 1920, of cedar lumber of the same grade and quality contracted to be shipped by complainant to respondent f. o. b. cars at South Pittsburg, Tenn., and unless the market price during this period or any part thereof was less than the cost of production, in which event the measure of damages for the period during which the market price was less than the cost of production would be the difference between the contract price of $100 per M. feet and the cost of production, that is, the cost to complainant of the logs delivered upon the mill yard, the cost of sawing the same into lumber, and the cost of delivering them f. o. b. on the cars for shipment.

But because the facts as to the amount of damages did not satisfactorily appear in the proof, the cause was referred to the Master, who was directed to consider the competent proof on file, and such additional proof as the parties might desire to offer, and report to the next term:

1. What was the difference between the contract price of $100 per M. feet and the market price of the grade and quality of cedar lumber sold and shipped by complainant f. o. b. cars South Pittsburg, Tenn., during each of the months from May to December, 1920, inclusive, reporting as to each month separately.

2. Whether the cost of production of said lumber as above defined during any of said months from May to December, 1920,

inclusive, exceeded the market price for such month or months and, if so, what the cost of production was.

3. What is the amount of complainant's damages for the breach of the contract sued on, measured as above directed.

All other matters were reserved until the incoming of such report. The master took proof thereon as directed, and made his report as required. Upon the items of reference he reported as follows:

First: That the difference between the contract price of $100 per M. feet and the market price of the grade and quality of cedar lumber sold and shipped by the complainant f. o. b. cars South Pittsburg, Tenn., during each of the months from May to December, inclusive, was as follows:

| Market Price per Thousand. | | Difference in Contract Price. | |
|---|---|---|---|
| May, 1920, | $99.00 | 28,000 feet, | $28.00 |
| June, 1920, | $89.00 | 28,000 feet, | 308.00 |
| July, 1920, | 85.00 | 28,000 feet, | 420.00 |
| Aug., 1920, | 78.00 | 28,000 feet, | 616.00 |
| Sept., 1920, | 74.00 | 28,000 feet, | 728.00 |
| Oct., 1920, | 75.00 | 28,000 feet, | 700.00 |
| Nov., 1920, | 71.00 | 28,000 feet, | 812.00 |
| Dec., 1920, | 70.00 | 28,000 feet, | 840.00 |

$4,452.00

Second: The cost of production of said lumber during any of the months from May to December, inclusive, did not exceed the market price for any of said months, the cost of production being $56 per M. feet f. o. b. cars South Pittsburg.

Third: That the amount of complainant's damages for the breach of contract sued on, measured as above directed, was $4,452.

Exceptions were filed to the report by the defendant, as follows:

(1) That the Master, under the first head, charged the defendant with $4,452 as the difference between the contract price of $100 per M. feet and the market price of the grade and quality of cedar lumber shipped by complainant f. o. b. cars South Pittsburg during the months of the year 1920, between May and December, inclusive; whereas it was insisted that the weight of the proof is to the effect that said difference is not so great in amount as that fixed; that the Master's report on this item was based on the deposition of L. F. Brown, whereas it was insisted that the depositions of Mr. Betterton and others showed there was no such difference in the contract price and the market price of said lumber; that the defendant bought lumber up until July at $100, and thereafter at a price never less than $85 for the year 1920.

(2) The Master's report under the third head was excepted to for the reason set out in the first exception, and for the additional reason, it was alleged, that the entire record reveals that the tapering boards shipped by complainant to the defendant under the contract constituted a breach thereof, and that the Chancellor was in error when he held otherwise.

The case coming on to be further and finally heard upon the whole record, including the report, the exceptions thereto and the motion to confirm, in an elaborate decree setting out the report and exceptions, etc., in full, the exceptions were overruled, and the report confirmed in all things and made the judgment of the court.

Whereupon it was accordingly further adjudged and decreed that complainant have and recover of the defendant, T. C. Betterton, as damages for the breach of the contract sued on in this cause the sum of $4,452, with interest from the date of the filing of the original bill, to-wit, July 25, 1921, being the sum of $979.44, making the total sum of $5,431.44, which amount it was adjudged complainant will recover of the defendant, together with all the costs of the cause, for which an execution was directed to issue.

From the foregoing decree, and from the former decrees, respondent prayed, obtained and perfected an appeal, and the same being regularly in this court, the errors assigned are:

"(1) The court erred in decreeing on August 4, 1923, that respondent T. C. Betterton breached the contract with complainant A. A. Tate to receive and pay for cedar lumber, and that complainant was entitled to recover damages from respondent T. C. Betterton on account of said breach of contract, where by respondent was bound to receive and pay for cedar lumber at the rate of two carloads per month during the eight months of 1920 which he refused to receive and pay for."

"(2) The court erred in his Memo Opinion filed July 30, 1923, in holding that complainant did not breach the contract by shipping tapering boards to the defendant."

"(3) The court erred in holding that the complainant recanted his cancellation of the contract, as evidenced in his letter of April 29, 1920, to defendant Betterton, and that said recantation was made prior to any acceptance thereof or action thereon by defendant."

"(4) The court erred in holding that complainant's letter of March 19, 1920, cannot be relied upon as a breach of contract for the same reasons that his letter of April 29, 1920, cannot be relied upon."

"(5) The court erred in his decree of reference to the Master in fixing the capacity of the cars at 14,000 feet each, and decreeing that complainant Tate was entitled to recover from de-

fendant Betterton upon such basis at the rate of two cars per month from May 1 to December 31, 1920."

Under the foregoing heads many alleged errors of the Chancellor were set out in the assignment in regard to the processes by which he arrived at his main conclusions, but these are mere sub-divisions of the main assignments, and are included therein.

Recurring to the question of the alleged breach of the contract by the complainant in the shipment of wedge shaped boards, if there had been anything in the pleadings that would authorize this contention, we think it was eliminated by the construction both parties put upon the contract in their dealings therewith in respect to the measurement of the lumber.

As found by the Chancellor, up until the time when a claim that lumber manufactured in such form was a violation of the contract was immaterial, because, coming after the contract was breached by the defendant, no such claim had ever been advanced that such lumber was not authorized to be shipped under the contract. On the contrary, in harmony with the custom previously existing, as the weight of the proof established, such lumber had been shipped as a matter of right, and as incident to the conservation of the value of such cedar timber, and not due to any occasional accident in its manufacture. This virtually appears in the following statement of the answer, not so much in what it claims as in what it concedes; namely, "And said contract was made on the explicit statement by the complainant that tapering or wedge shaped boards would be practically eliminated, **and if such boards were shipped they would be measured at the narrow end.**" (Boldface ours) "Defendant neither admits or denies what was the custom of the cedar mills in reference to cutting cedar boards in wedge or tapering shape, but defendant avers that it had never been its custom to pay for such boards except upon the measurement of the smaller end thereof."

We think, under the circumstances, that the testimony is convincing, and so find, that not only was it not specifically understood that such boards were not to be eliminated, but the weight of the testimony is that such boards were by custom included as authorized shipments under the contract, though they were made the cause of disagreement; and while contrary to the Chancellor's opinion the defendant may have intended to refer to the first car shipped under the contract when he said "if there was any difference in the quantity of tapering boards in the last car, or last cars shipped from the first car shipped, the difference was not appreciable," such mistake, if it was a mistake made by the Chancellor, was not material, for if by such answer it was meant that the first car (a car just sold and delivered previously to the signing of the contract, the measurements of which was not reported upon until after the contract for delivery

of output had been signed) was serving as a sample as to per centage of wedge shaped boards allowable, and that defendant meant to refer to the first and other cars shipped under the contract as containing no appreciable difference, but that all such cars contained a larger per centage than was authorized by the first or sample car, then here again the weight of the proof is against him, because such weight of proof shows that the latter car did not contain a greater per centage of such boards·than the first or sample car, even if such car had by contract been made the standard for subsequent shipments.

However, when it is remembered that the complainant only shipped the defendant two cars after the receipt of the sample car, the answer of the defendant referred to including two cars at least as not differing appreciably from the first, necessarily referred to the sample car, showing that the Chancellor was right in his interpretation of such answer. If defendant meant otherwise, or was mistaken, he has no one to blame for it but himself and his careless manner in testifying, which is evidenced again in letters that stated that he measured the wedge shaped boards at the narrow end, whereas his testimony states that such boards were measured one-third the distance from the narrow end. We do not think the Chancellor's opinion is rightly subject to the criticism that he made a superficial examination of the record. On the contrary we think the record justifies his conclusion in this regard, with which we also agree.

We think defendant's brief is itself confused, and for some reason this may have involved complainant's brief in the same infirmity; for it apparently concedes that "another car was shipped, but the measurement is not shown in the record."

On page 46 of appellant's printed brief the paragraph opens: "This was error, (2) because the proof shows that the first car shipped was 12,000 feet according to complainant's measurement, and 11,400 feet according to defendant's measurement."

Supporting this insistence is cited page 12 of the record. Turning to page 12 of the record we find that it is the complainant's testimony that is relied upon to establish this claim, and it is disclosed in question and answer 29 that complainant was referring to the last car shipped, instead of the first, and he described this as "about" 12,000 feet. Manifestly the brief has made two cars out of the last one shipped. It also appears that the brief fixes the first or sample car as the second. This car, while shipped before the signing of the contract, was not reported upon as to any difference in the measurement until afterwards. The record shows considerable correspondence before the contract was entered into, but does not show any other shipments than the three cars.

Coming now to the only real issue in this lawsuit! While we agree with the Chancellor in his conclusion that if it be assumed that the letter of April 29th was an unequivocal announcement of a determination not to ship another car, upon which the defendant would have been authorized to act, nevertheless the defendant, having ignored such suggestion in his reply and simply requested a delay in shipment until further orders, the complainant's letter tendering additional shipments would have been a sufficient recantation and have revitalized the contract, with mutual obligations, continuing. Yet if this be tantamount to finding that such letter did in fact contain an unequivocal statement of such determination to discontinue shipments, we disagree with such holding. We find from the weight of the proof that the letter as it was received did not contain any such announcement; that what it did contain were the words "If I ever ship you another car of lumber I will send you a piece tally, or endeavor to send you a piece tally;" that therefore without further ceremony the defendant had no right to treat it as a breach, and his letter containing the postscript set out in this opinion cannot be regarded as anything else than a request for the postponing of shipments, unless, indeed, it be regarded as a distinct breach.

We do not deem it necessary to enter into an extended discussion of the proof guiding us to our conclusions as to the letter of April 29th. While it may have been on file and its altered character unnoticed by anyone until about the time of the filing of the petition, we have no doubt as to the weight of the proof as to its original import, the strongest corroboration of which is found in the correspondence of the defendant himself after having received the letter. Men of intelligence, finding it necessary or desirable to justify their actions, and having at hand a complete and altogether sufficient reason furnished by him to whom such explanation might seem to be due, do not resort to the offering of possibly inadequate excuses as a justification which might even tend to contradict the real reason, but rather do they make their defenses in the strongest light of which the case is possible. Having, therefor, a letter from the complainant which stated "I will never ship you another car," and being called upon later for a reason for his not receiving the car, he would not have been likely to have contented himself with the declaration that "we certainly do not wish to do you any injustice, but we do not feel under any obligation to accept more of this cedar from you at this time, for when we received your letter signifying that you doubted whether or not you would ship us any more, we made our arrangements to buy, and did buy elsewhere." This extract is from a letter of May 17th, which opened with this statement: "We have yours of the 15th, and if you will look back over copies of letters that you wrote us on the cedar, you will find that you did not evi-

dently feel that the contract was very binding on you, for you wrote us in two letters stating that you doubted whether or not you would care to ship us any further, and the last car you shipped us was after we thought you had decided not to ship us any more, and our judgment is that you only shipped it to us for the reason you found the price of cedar was declining.''

Here is a construction which the defendant put upon the two letters soon after their reception, which is in harmony with what is now the contention of the complainant, and which was the complainant's construction and remembrance of the letter even before the discovery of any change, and while he was yet contending with the defendant as to his right to ship. In a letter of May 25th he writes to the defendant: ''In reply to yours I note what you say, that you did not think I would ship you any more cedar. I did not say I would not, and shipped you one car since.''

So, at the most, the complainant could only be charged with a threat to discontinue shipments, being dissatisfied with the measurements, but nothing short of an unequivocal gesture as to breaching it would have released the defendant, if taken advantage of, which gesture was not made.

In the letter of March 19th complainant had stated that if defendant could not pay his (complainant's) invoice, to pay his own, and he would not ship any more. To this letter defendant replied on March 22: ''We have your favor of the 19th, and regret to notice that you evidently again think we are measuring against you in our tally on cedar. . . . We find your invoice covering this car has been paid by our accountant, who has divided the difference in the measurement with you.'' It is perceived that, instead of accepting complainant's invitation to terminate their relation at this time, the difference was divided and the alternative put up to the complainant.

Moreover, the defendant rightly interpreted the situation in which this action placed their relationship, and followed it up on March 29th with the following letter: ''Will you please advise us if you have definitely decided not to ship us any more cedar? We regret that there was a small difference on the second car that you shipped us. Like your good self we try to be entirely fair and just in the measurements. . . .''

This letter must have passed the one from complainant on the way, for on March 29th the complainant answered the communication just preceding this last, and which informed him that the difference had been divided, as follows: ''Yours to hand, and note that you divided the difference in the last car I shipped you. Now I would like to know how you measured this car. I wrote you and told you

how I measured it. As I have another car almost ready to ship, would like to hear from you at once.''

To this letter defendant replied on March 31st, explaining that so far as the method of measurement was concerned, that ''our method seems to be exactly like yours, except the tapering boards are measured at the small end.'' In this letter it was stated: ''We like your cedar. It is good stock, and we would like to handle it for you, and would be pleased if you would ship us one more car and let us see if we can get together on the measurement. . . .''

On April 16th another car was shipped and the following letter written to defendant: ''Enclosed you will find bill of lading for car of cedar lumber, which I measured for 12,096 feet.'' Defendant acknowledged receipt of this car in a letter as follows: ''We have on yard A. T. & S. F. Car 59494, loaded with cedar, which the railroad informs us was shipped by you. For some days we did not know who this car was from. Will appreciate it if when shipping you will always furnish us at once with B/L and invoice covering car, so we can easily keep up with it. We have not as yet received invoice from you covering this car and will be pleased to have you mail same at once. Not knowing whether you intended to ship us any more or not, we bought several cars of cedar. Are pretty well stocked up at this time, and would not want further shipments until so notified.'' On April 23rd a report on this car was made to complainant in a letter from which we quote the following extracts: ''We hand you herewith piece tally on A. T. & S. F. Car 59495, and regret to notice that this tally is 733 feet short of yours, your measure being 12,096, ours 11,363.'' In this letter defendant says further: ''We certainly do not wish to seem to undertake to be severe in our measurement,'' and they offered to allow him to dispose of the stock to others at his measurement if he could do so, but in that event would be pleased to have him reload it as ''early as possible,'' etc. But ''If you wish us to keep it at our measurement, 11,363, will be willing to do it, and this is certainly all we can get out of the stock.''

This letter is followed on April 29th by another enclosing check for the car, stating: ''We wrote you fully in regard to this car, but have heard nothing from you. Are therefore paying you for this car on our measurement, and the deduction is entirely due, we take it, to the manner, as we have stated before, in which you cut these boards, we measuring them at the narrow end.''

The letter of April 29th, about which the controversy has arisen as to its change, evidently passed this one on the road, and this letter is the one mainly relied upon as a breach on the part of the complainant, as manifestly from the foregoing there had been no breach

by the complainant before, though it might be said he had been seriously contemplating the abandonment of shipments.

As construed by us this letter of April 29th was not a breach of the contract. At best it could only be said that complainant was considering its abandonment, as the measurements were evidently unsatisfactory. The complainant stated that as to this car he had himself measured the wedge shaped boards at the narrow end. If defendant had at this time desired to terminate the contract. he should have followed up this opportunity and have requested again an unequivocal statement as to complainant's intentions, as he had done before. But as it was he allowed complainant to decide in favor of its continuance, courteously replying to the letter of April 29th on May 6th, ignoring the threat, and in a postscript requesting: "Kindly do not ship us further unless you notify us beforehand and we so advise you."

Except as herein otherwise indicated we agree with the conclusion of the Chancellor in every particular.

Regarding the measure of damages, we think under the circumstances it was properly fixed. At least, as it turned out, if there was any injury it resulted to the complainant; but he, having adopted the measure fixed as the claim of his bill, could not, and did not complain.

It is insisted, however, that the Chancellor should not have adopted the flat capacity of 14,000 feet per car as the arbitrary basis for calculation. The measurement of the three cars that were shipped is in the record; one, as stated by complainant, was measured in the middle, one about one-third from the narrow end, and the third at the narrow end. The average of these shipments would have exceeded the capacity fixed. The number of cars authorized were two per month, and as the record indicates that complainant maintained this average during the winter months, it was altogether probable that he could have more than done so during the better weather that usually prevails the remaining months of the season through which his contract was to run.

In effect these conclusions dispose of adversely every material assignment of error made by appellant. The result is that they are all overruled, and the judgment of the lower court affirmed, with costs against appellant.

Portrum and Thompson, JJ., concur.